**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED: AUGUST 6, 2008
08CV4432
JUDGE ST. EVE
MAGISTRATE JUDGE ASHMAN
CEM

Airtex Products, LP, a Delaware Limited Partnership

Plaintiff,

v.

Asian Century Industries (Tianjin) Ltd., a Chinese Corporation, and Tony Kuo.

Defendants.

CASE NO:____________________

JURY DEMAND REQUESTED

**COMPLAINT FOR DECLARATORY JUDGMENT AND RETURN OF TOOLING**

Plaintiff Airtex Products, LP for its Complaint against Defendants, Asian Century Industries (Tianjin) Ltd. ("Asian Century") and Tony Kuo, states as follows:

**NATURE OF CASE**

1. Airtex is a manufacturer and supplier of fuel pumps for the automotive and other industries. At other times, relevant to its claims in this action, Airtex manufactured and sold water pumps for the automotive and other industries.

2. Beginning in September 2001, Airtex began to buy certain water pump components from Defendant Asian Century. Airtex also provided tooling to Asian Century to enable it to manufacture the water pump components sold to Airtex. The purchases and Airtex's furnishing of tooling were pursuant to purchase orders issued by Airtex.

3. In or about May 2006, Airtex's parent company, United Components, Inc. ("UCI"), purchased a corporation known as ASC Industries, Inc. ("ASC").

4. ASC is engaged in the business of manufacturing water pump components and sells the completed water pumps for the automotive and other industries.

5. Following UCI's acquisition of ASC, the water pump operations of its subsidiaries, Airtex and ASC, were consolidated. Airtex thereafter ceased to manufacture and sell water pumps and ceased purchasing water pump components from Asian Century.

6. Upon realizing that the relationship between Asian Century and Airtex was ending, Defendant Tony Kuo, on behalf of himself and Asian Century, attempted to establish a relationship with ASC for the sale of water pump components. Defendants' efforts were unsuccessful.

7. Following the failure of these efforts, Defendants, beginning in January 2007 through various correspondence and communications, made claims that Airtex and Asian Century had been engaged in a joint venture or partnership and that Defendants were entitled to compensation as a consequence of Airtex's termination of the relationship.

8. Defendants also contended that Airtex and Asian Century had an implied agreement requiring Airtex to continue to purchase water pump components from Asian Century, and that Airtex breached this implied agreement.

9. Defendants have retained counsel and claim they have been damaged by Airtex's conduct in the amount of $6 million. Defendants have made a written demand of $2 million in compensation from Airtex.

10. Airtex and Asian Century had an arms-length purchaser-supplier relationship that was governed solely by the terms of the purchase orders issued by Airtex.

11. Defendants and Airtex did not agree to or enter into either a joint venture or partnership relationship. Nor did Defendants and Airtex have an implied agreement relating to the purchase and sale of water pump components.

12. Airtex has informed Defendants of these facts in correspondence and, thus, has refused to pay Defendants any of the compensation they seek. Airtex has also demanded that, pursuant to the terms of the purchase orders, Defendants return all tooling that Airtex had supplied to Asian Century.

13. Defendants have refused, to date, to return any of the requested tooling and continue to demand $2 million from Airtex.

14. As a consequence of Defendants' refusal to return Airtex's tooling, Airtex now brings this action to recover its tooling from Asian Century and its costs and attorneys' fees incurred in bringing this action as allowed for under the purchase orders.

15. As a consequence of Defendants' continued allegations of breach and legal demands for $2 million, Airtex also seeks a declaration (i) that no joint venture or partnership exists or ever existed among Airtex and Defendants, (ii) that Airtex has no legal or equitable obligation to continue to purchase any products from Asian Century, and (iii) that Airtex owes no compensation to Defendants; as well as any other relief the Court deems necessary.

**PARTIES**

16. Plaintiff Airtex Products, LP is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 407 West Main Street, Fairfield, IL 62837.

17. The two partners of Airtex are UCI-Airtex Holdings, LLC and Airtex Industries, LLC.

18. UCI-Airtex Holdings, LLC is a corporation organized under the laws of and incorporated in the State of Delaware with its principal place of business located at 14601 Highway 41, Evansville, IN 47725.

19. Airtex Industries, LLC is a corporation organized under the laws of and incorporated in the State of Delaware with its principal place of business located at 14601 Highway 41, Evansville, IN 47725.

20. Defendant Asian Century is, upon information and belief, a foreign company organized under the laws of and incorporated in China with its principal place of business at 89th Dafeng Road, Hangu District, Tianjin, China 300480.

21. Defendant Tony Kuo is an individual who, upon information and belief, resides at 508 St. Vincent Lane, Foster City, California 94404 and is a citizen of California.

22. Upon information and belief, during the relevant period, Mr. Kuo has had a controlling ownership interest in Defendant Asian Century and has exercised control over its decisions and operations.

**OTHER ENTITIES REFERRED TO IN THIS COMPLAINT**

23. Airtex is an affiliate of United Components, Inc. ("UCI"). UCI is a designer, manufacturer and distributor of a broad range of filtration products, fuel systems, cooling systems products and engine management systems. UCI acquired Airtex in 2003.

24. ASC Industries, Inc. is another affiliate of UCI and is a manufacturer of water pumps for the automotive and other industries. UCI acquired ASC in 2006.

25. Neither ASC nor UCI is a party to this action.

**JURISDICTION AND VENUE**

26. Subject matter jurisdiction exists over the claims herein under 28 U.S.C. § 1332. There is complete diversity of citizenship among Plaintiff Airtex and its partners, which are citizens of Delaware, Indiana, and Illinois, and Defendants Asian Century and Tony Kuo, which

are citizens of China and California. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

27. The Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209(a)(1) and (7) because this cause of action arises from Defendants transacting business in the State of Illinois, and/or making or performing a contract or promise substantially connected with the State of Illinois.

28. The parties have agreed that venue is proper in this judicial district pursuant to Airtex's purchase orders, the terms of which govern Airtex's purchase of products from Asian Century and its furnishing of tooling to Asian Century. (See Exhibit B at § 23.)

29. Venue is also proper in this district under 28 U.S.C. § 1391(a)(3).

**ALLEGATIONS RELATING TO AIRTEX'S CLAIMS**

**Airtex's Water Pump Purchases from Asian Century**

30. In September 2001, Airtex began purchasing water pump components from Asian Century.

31. The quantity of water pump components and other terms of purchase were governed by purchase orders submitted by Airtex to Asian Century.

32. One form of purchase order applied to all of Airtex's purchases from the inception of its buyer-seller relationship with Asian Century through and until July 31, 2005. A true and accurate copy of this purchase order is attached at Exhibit A.

33. Beginning in or around August 1, 2005, the form of Airtex's purchase order changed. This form of order applied to all of Airtex's purchases from Asian Century through February 2007. A true and accurate copy of this purchase order is attached at Exhibit B.

34. Each of Airtex's applicable purchase orders (hereafter, collectively "Purchase Orders") provide that they are the complete and entire agreement between the parties. (See Exhibit A at § 2 and Exhibit B at § 18.)

35. Since September 2001 Airtex has purchased approximately $11 million in water pump components from Asian Century pursuant to the terms of the Purchase Orders at Exhibits A and B.

**Airtex's Furnishing of Tooling to Asian Century**

36. Airtex also provided Asian Century with certain tooling necessary for the manufacturing of water pump components Airtex purchased from Asian Century.

37. Between November 2001 and September 2005, Airtex issued purchase orders and made payment to Asian Century for this tooling which was then purchased and delivered to Asian Century's factory. Airtex paid approximately $521,000 for this tooling.

38. Between November 2001 and July 2005, Airtex issued purchase orders in the form of Exhibit A for tooling to Asian Century.

39. Between August 2005 and September 2005, Airtex issued purchase orders in the form of Exhibit B for tooling to Asian Century.

40. The Purchase Orders each state that this tooling provided by Airtex to Asian Century is the property of Airtex and must be returned to Airtex upon its request. (See Exhibit A at § 6 and Exhibit B at § 13.)

41. The Purchase Orders at Exhibits A and B are the only agreements applying to Airtex's purchases of water pump components from Asian Century and Airtex's provision of tooling to Asian Century.

**Events Necessitating Airtex's Filing of this Action**

42. In or about May 2006, UCI acquired ASC.

43. In light of UCI's acquisition of ASC, Airtex began to wind down its water pump business. By February 2007, Airtex had ceased purchasing water pump components from Asian Century and from its other suppliers.

44. After Airtex stopped purchasing components from Asian Century, Defendants, beginning in January 2007, made claims that Airtex and Asian Century had been parties to a purported joint venture or a partnership, not merely a buyer-seller relationship.

45. Defendants argued that in furtherance of this relationship, they had made a "large investment" into the relationship with Airtex and, thus, were entitled to "equitable compensation" from Airtex as a consequence of Airtex's termination of the relationship. (See Letter from Tony Kuo to Bruce Zorich, dated January 9, 2007, attached at Exhibit C, and Letter from Tony Kuo to Bruce Zorich, dated April 30, 2007, attached at Exhibit D.)

46. Again, in a letter dated October 18, 2007, Defendants stated that they were entitled to "fair compensation" for the time and money Defendants spent to build business for Airtex. Defendants demanded compensation in the amount of $2 million. (See Letter from Tony Kuo to Bruce Zorich, dated October 18, 2007, attached at Exhibit E.)

47. Airtex has never entered into a joint venture with Asian Century. Airtex has never entered into a joint venture with Mr. Kuo.

48. Airtex has never formed a partnership with Asian Century. Airtex has never formed a partnership with Mr. Kuo.

49. In a letter dated December 3, 2007, Airtex, through its counsel, informed Defendants that no joint venture or partnership was ever formed between Defendants and Airtex,

that Defendants and Airtex were not and never had been partners, and that Airtex did not have any agreement with Defendants with respect to the purchase of water pump components, either express or implied, beyond that stated in the Purchase Orders. (See Letter from Brian Lewis to Tony Kuo, dated December 3, 2007, attached at Exhibit F.)

50. In this letter, Airtex also demanded the immediate return of its tooling. (See id.)

51. Defendants responded in a letter dated January 7, 2008, disputing that no joint venture or partnership had been created. Defendants again asked for "reasonable compensation" as a result of Airtex's termination of the relationship. (See Letter from Tony Kuo to Brian Lewis, dated January 7, 2008, attached at Exhibit G.)

52. In February 2008, Airtex responded, through its counsel, to Defendants and again informed them that there was no evidence that either a partnership or joint venture was ever formed between Defendants and Airtex. Counsel informed Defendants that Airtex would therefore not provide any "additional compensation beyond the substantial revenues that [Defendants] already earned from sales to Airtex." Counsel further stated that Airtex considered "this issue to be closed." (See Letter from Brian Lewis to Tony Kuo, dated February 18, 2008, attached at Exhibit H.)

53. On April 28, 2008, Airtex received another letter from Defendants—this time through their counsel—restating that the parties had been engaged in a joint venture and that Defendants were entitled to compensation as a result of Airtex's termination of the relationship. (See Letter from Matthew P. Guichard to Brian Lewis, dated April 28, 2008, attached at Exhibit I.)

54. Defendants' counsel also alleged that Airtex and Defendants had an implied in law agreement for the ongoing purchase of water pump components, and Airtex breached this alleged agreement. (See id.)

55. Counsel's letter also restated Defendants' demand for compensation in the amount of $2 million. (See id.)

**COUNT I**
**(Breach of Contract)**

56. Airtex restates the allegations in 1–55 as if set forth fully in this Count.

57. The Purchase Orders are valid and enforceable agreements that govern the parties' rights concerning the tooling purchased by Airtex for use by Defendants in the manufacturing of water pump components for Airtex.

58. Pursuant to the Purchase Orders, Airtex is the owner of the tooling and is entitled to its return from Defendants, upon request.

59. Airtex has requested that Defendants return all tooling purchased by Airtex.

60. Airtex has satisfied all other conditions precedent, to the extent they exist, for the return of its tooling.

61. Without legal justification, Defendants have failed to return said tooling to Airtex, thereby breaching the Purchase Orders.

62. The Purchase Orders provide that Airtex is entitled to recover its reasonable attorneys' fees, expert fees, costs and expenses of litigation in the event it becomes necessary for Airtex to enforce the terms and conditions of the Purchase Orders. (See Exhibit A at § 18.)

WHEREFORE, Plaintiff prays for a judgment to be entered ordering Defendants to return any and all tooling in their possession belonging to Airtex or, in the alternative, award damages

to Airtex in the amount of said tooling, and for recovery of its attorneys' fees, costs and expenses of litigation and further relief as is just under the circumstances.

**COUNT II**
**(Conversion)**

63. Airtex restates the allegations in 1–55 as if set forth fully in this Count.

64. The Purchase Orders are valid and enforceable agreements that govern the parties' rights concerning the tooling purchased by Airtex for use by Defendants in the manufacturing of water pump components for Airtex.

65. Pursuant to the Purchase Orders, Airtex is the owner of the tooling and has the right to the immediate possession of the tooling upon request to Defendants.

66. Airtex has requested that Defendants return all of Airtex's tooling.

67. Despite these requests, Defendants have failed to return Airtex's tooling, thereby wrongfully and without authorization assuming control, dominion, and/or ownership over Airtex's tooling.

68. The Purchase Orders provide that Airtex is entitled to recover its reasonable attorneys' fees, expert fees, costs and expenses of litigation in the event it becomes necessary for Airtex to enforce the terms and conditions of the Purchase Orders. (See Exhibit A at § 18.)

WHEREFORE, Plaintiff prays for a judgment to be entered ordering Defendants to return any and all tooling in their possession belonging to Airtex or, in the alternative, award damages to Airtex in the amount of said tooling, and for recovery of its attorneys' fees, costs and expenses of litigation and further relief as is just under the circumstances.

**COUNT III**
**(Declaratory Judgment)**

69. Airtex restates the allegations in 1–55 as if set forth fully in this Count.

70. The Purchase Orders are valid and binding agreements.

71. Airtex had no obligation under the Purchase Orders to continue purchasing water pump components from Defendants beyond those stated in the Purchase Orders.

72. Upon cessation of Airtex's purchase of water pump components from Defendants, Defendants advised Airtex that a joint venture and/or partnership existed between the parties and that Defendants are entitled to $2 million in compensation as a consequence of Airtex's termination of that joint venture/partnership.

73. Defendants have also alleged that, in the alternative, Airtex had an implied agreement with Defendants for the continued purchase of water pumps, and Airtex's termination of its purchases from Defendants constitutes a breach of that agreement.

74. Airtex never entered into a joint venture or partnership with Defendants.

75. As a consequence, Airtex has refused Defendants' demands for compensation and/or alleged damages.

76. By virtue of the foregoing, there is an actual controversy existing between Airtex and Defendants concerning whether Airtex and Defendants are parties to a joint venture or partnership and/or whether Airtex breached an agreement with Defendants for the continued purchase of water pumps. This dispute requires a declaration of rights pursuant to 28 U.S.C. § 2201.

77. Airtex has a tangible interest in knowing whether or not it is a party to a joint venture or partnership as it might require Airtex to make compensation payments relating thereto. Airtex has a similar interest in knowing whether it had an implied agreement with Defendants and whether it has breached that alleged agreement.

78. The Purchase Orders provide that Airtex is entitled to recover its reasonable attorneys' fees, expert fees, costs and expenses of litigation in the event it becomes necessary for Airtex to prosecute any litigation arising out of or as a result of the Purchase Order. (See Exhibit A at § 18.)

WHEREFORE, Plaintiff prays for a judgment and declaration in its favor and against Defendants Asian Century and Tony Kuo that Plaintiff and Defendants were not parties to a joint venture or partnership, that Plaintiff has no obligation to continue purchasing water pumps from Defendants, that Airtex owes no additional compensation or damages to Defendants, and for recovery of its attorneys' fees, costs and expenses of litigation, and further relief as is just under the circumstances.

**JURY DEMAND**

Airtex demands a jury on all issues triable.

Respectfully submitted,

Airtex Products, LP

By: /s/ Brian Lewis
One of its Attorneys

Brian W. Lewis (# 6190792)
Paul Olszowka (#6291267)
Tracy Hannan (#6281834)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive - Suite 3000
Chicago, IL 60606-1229
(312) 201-2000

08CV4432
JUDGE ST. EVE
MAGISTRATE JUDGE ASHMAN

# AIRTEX STANDARD TERMS AND CONDITIONS (4/99)

1. **General Terms**
These terms and conditions shall apply to all sales of goods or services by Seller to Airtex ("Buyer") and to any quotation by the Seller for sales. Buyer hereby buys and Seller hereby sells those good or services set forth on the face hereof subject to the terms set forth below, the terms and conditions of purchase referenced on the face of this Agreement and the terms of any documents, drawings or standards attached hereto, or which are otherwise hereby incorporated and made a part of this Agreement.

2. **Acceptance, Binding Effect and Modification**
Seller is deemed to have accepted this offer when Seller signs or returns the acknowledgment copy of this Agreement to Buyer, or when Seller begins performance of this order. Seller's acceptance is solely limited to the acceptance of Buyer's terms expressly set forth in this Agreement. These terms and conditions shall not be superseded by any other terms or conditions in Seller's purchase order, the parties having expressly agreed that any terms in Seller's purchase order shall be without force and effect. This Agreement is the complete, entire and exclusive statement of the terms of the understanding between the parties, merging and superseding all prior negotiations or agreements of the parties either written or oral, made either prior to or contemporaneous with this Agreement. This Agreement cannot be modified or amended except by a subsequent written instrument executed by the parties which expressly supersedes the provisions of this Agreement.

3. **Standards and Quality Specifications**
In addition to satisfying any and all specifications attached to or set forth in this Agreement, including, but not limited to any engineering drawings, specifications or sketches provided to Seller, Seller expressly warrants that the goods and/or services provided satisfy or exceed all applicable legal requirements established by federal or state law, and/or applicable engineering or material standards, including, but not limited to, any ASTM, ANSI, or other recognized standards with respect to quality, tolerances, concentricity, workmanship, or the machinability of any goods or services provided hereunder. Seller shall provide goods and/or services that conform to or exceed any drawings, specifications and data which are part of this order or which were provided to Seller by Buyer or Buyer's customer. Seller shall maintain an inspection and quality system acceptable to Buyer to fully satisfy Seller's quality requirements hereunder. The parties agree that a material breach of this Agreement will occur if more than 2% of the Seller's goods fail to conform to the specifications or other standards or requirements, including quality requirements, established under or expressed in this Agreement.

4. **Changes in Specifications by Buyer**
If the material hereunder is to be manufactured in accordance with specifications, drawings or designs, Buyer may, at any time, by written change order, make changes in said specifications, drawings and designs. If Buyer does so Seller shall comply therewith without delay. Thereafter, the Seller may transmit to Buyer a statement of the effect, if any, of such change orders on the Seller's cost and ability to make deliveries. Upon the basis of this and any other available information, Buyer and Seller shall agree upon an equitable adjustment of the purchase price and any other relevant provision, and such agreement shall be incorporated in a supplement to this order if not stated on reverse side.

5. **Delivery, Shipping and Insurance**
Time is of the essence in this Agreement. Seller shall make deliveries in the quantities and at the time specified in this Agreement. No charge for packing, boxing, storing, transportation or insurance will be allowed unless approved by Buyer in writing. Goods must be packaged and distributed to conform with carrier's classifications and rules so as to obtain the lowest freight costs.
Each package or container must contain a packing slip with the number of this order and the quantity and items therein plainly indicated. When goods for more than one order is packed in a single container, a packing slip showing all order numbers, items and quantities of each order contained therein must be enclosed. Changes in shipping and packing instructions may be made by Buyer on reasonable notice. All bills of lading relating to this order must likewise bear the number of this order.
Each individual box and shipping container is to be marked with the Buyer's part number and the quantity of items contained therein.

6. **Proprietary Rights and Tooling**
All right, title and interest in and to any goods provided hereunder shall pass to Buyer as soon as the goods are acquired or fabricated in accordance with this order. Seller shall keep all tooling, blueprints, sketches or other information or tangible items received from Buyer as bailed property of Buyer and shall keep such information confidential and not disclose such information or tangible items to any third-parties other than Buyer. It is expressly understood that Seller shall not furnish to any third-party other than Buyer, any goods, parts or services covered by any blueprints, plans or specifications of Buyer without Buyer's prior written consent and permission. To the extent Seller is in possession of any tooling of Buyer used in the production, manufacture or designs of any goods or materials under this Agreement. Seller shall not manufacture, sell or otherwise dispose of any products using Buyer's tooling to any party than Buyer except where specifically authorized by Buyer. Any tooling provided to Seller by Buyer is the sole and exclusive bailed property of Buyer and shall be returned to Buyer upon request.

7. **Force Majeure**
Buyer will have no liability or obligation to Seller of any kind, including but not limited to any obligation to accept products or goods, arising from any delay or failure to perform all or part of this Agreement as a result of causes, conduct or occurrences beyond Buyer's reasonable control, including, but not limited to, commercial impracticability, fire, flood, failure of Buyer to deliver goods, materials or equipment to Seller, act of war, civil disorder or disobedience, act of public enemies, problems associated with transportation (including car or truck shortages), acts or failures to act of any state, federal or foreign governmental or regulatory authorities, labor disputes, strikes, or failure of suppliers to make timely deliveries of materials, goods or services by Buyer.

8. **Inspections and Acceptance of Goods**
Buyer may, but is not required to, inspect all goods upon delivery. Payment with respect to delivered goods will not constitute acceptance. Buyer may reject any goods that do not meet the specifications, warranties or other requirements of this Agreement, or are otherwise defective in whole or part, at any time after delivery.
Any goods rejected by Buyer will be at Seller's risk and expense and Seller will not thereafter tender such goods for acceptance unless the former rejection or requirement of correction is disclosed and fully repaired and remedied. Seller will reimburse Buyer for any packaging, handling and transportation costs incurred with respect to rejected goods. Buyer, at its discretion, reserves the right to reject reworked goods or products that are re-delivered for its acceptance.
Buyer may revoke its acceptance of goods at any time, whether or not a substantial modification in the goods has been made, if a defect in the goods which could not have been discovered during Buyer's normal inspection procedure (or which is not normally discoverable until the goods are used, assembled or machined) impairs the value of the goods to Buyer.
Neither Buyer's exercise of, nor its failure to exercise, any rights provided hereunder, will relieve the Seller from responsibility for producing conforming goods.

9. **Title and Risk of Loss**
Seller warrants that, upon delivery, it has transferred free and clear title to the goods to Buyer and that there are no liens upon the goods. Title and risk of loss of the goods shall pass from Seller to Buyer upon written acceptance of the goods at Buyer's receiving dock.

10. **Price Protection**
Seller warrants that the prices charged Buyer do not exceed the lowest prices charged by Seller for similar goods and services to its other customers.

11. **Event of Default**
Each of the following shall constitute an event of default by Seller under this Agreement:
a. Failure to comply with any of the provisions of this Agreement, including, but not limited to, all express or implied warranties;
b. Failure to provide the prompt performance required hereunder or to observe any covenant or obligation relating to compliance with applicable law, rule or regulation covering the sale, distribution or transfer of products hereunder;
c. Any statement or representation by Seller in connection with this Agreement which shall be determined to be false or incorrect on the date made;
d. Dissolution, merger or consolidation or transfer of ownership of at least 50% of Seller or its parent corporation,
e. Insolvency of Seller or its parent corporation, or;
f. Default by Seller under any other agreement with Buyer.

12. **Termination**
In the event of a default, Buyer may, in addition to exercising any and all legal or equitable rights or claims, terminate this Agreement without any obligation to Seller by providing ten (10) days prior written notice. This Agreement can otherwise by terminated by Buyer upon thirty (30) days advance, written notice, without cause. In the event of termination, Seller shall promptly return and/or ship all Buyer's goods or equipment in its possession in a manner directed by Buyer, and shall receive reasonable reimbursement for such goods so shipped, but such reimbursement shall not be given if Seller is in default hereunder.

13. **Express Warranty**
In addition to any warranties (express or implied) or remedies afforded Buyer in law or equity, Seller expressly warrants that the goods and services provided under this Agreement conform to the description and specifications herein. The goods are free from defects in material and workmanship, are merchantable, and are fully fit for their intended purpose, including the purpose for which they will be used by Buyer's customer.

14. **Year 2000 Computer Compliance**
Seller warrants that its performance hereunder shall not be delayed or otherwise affected by a failure by Seller to be fully Year 2000 computer compliant. Seller specifically warrants that it is Year 2000 computer compliant and that any failure of it to be so compliant shall not constitute an excuse to its performance hereunder or a force majeure event.

15. **Applicable Law**
This Agreement shall be governed by the internal laws (exclusive of the conflicts of law principles) of the State of Illinois.

16. **Assignment**
There shall be no assignment of this Agreement or any interest herein unless specifically agreed to in writing by Buyer.

17. **Waiver**
No claim or right arising out of the breach of this Agreement can be discharged in whole or part by a waiver or renunciation of the claim or right unless the waiver or renunciation is supported by consideration and is in writing signed by the aggrieved party.

18. **Attorneys' Fee**
In the event it becomes necessary for Buyer to enforce the terms and conditions of this Agreement or to defend or prosecute any litigation arising out of or as a result of this Agreement, or the sale of goods to Buyer by Seller, Buyer shall be entitled to recover from Seller, in addition to any other relief granted, reasonable attorneys' fees, expert fees, costs and expenses of litigation.

19. **Limitation of Buyer's Liability**
Buyer's entire liability to Seller, if any, for any claims, demands, causes of action, arising in tort, contract, or otherwise, including with respect to any statutory claim, is limited solely to the purchase price actually paid by Buyer under the terms of this Agreement. Notwithstanding the foregoing limitation, Buyer shall not be liable to Seller for indirect, special, incidental, consequential, exemplary or punitive damages arising under this Agreement, or otherwise, with respect to the sale, purchase, or use of the goods, including any lost revenue or profits, business interruption or damage to business reputation, regardless of the theory upon which any claim may be based, including, without limitation, breach of contract, breach of warranty, negligence, product liability or any statutory cause of action.

20. **Indemnification**
To the fullest extent permitted by law, Seller agrees to protect, defend, indemnify and hold harmless Buyer (including Buyer's officers, agents, employees, representatives, and affiliated companies) from and against all claims (including, but not limited to, product liability claims, strict liability claims, claims resulting from any defective design, workmanship or material, or claims asserting breach of contract, negligence, malfeasance, breach of warranty, failure to meet specifications or other default with respect to Seller's goods or services) losses, damages (including, but not limited to, actual, consequential and incidental damages), causes of action, suits and liabilities of every kind, including all expenses of litigation, court costs, and attorneys' fees, for injuries to or death of any person (including, but not limited to, Buyer's employees or Seller's employees that may enter upon Buyer's premises), or for damage to any tangible or intangible property or property or rights (including, but not limited to, purely economic losses), arising out of or relating to the goods or services provided hereunder, their manufacture, design sale, transportation, installation, erection, testing, operation, maintenance, repair, recall, and use or non-use. Seller's indemnity obligations under this paragraph include, but are not limited to, the obligation to indemnify and hold Buyer harmless from claims, losses and damages described above which arise out of or result from (1) the concurrent negligence of Seller and Buyer, or Seller and any other person or entities and/or (2) any alleged defects or unreasonably dangerous conditions in the goods provided. It is the express intent of the parties that the indemnity provided for in this paragraph includes indemnity by Seller to indemnify and protect Buyer from the consequences of Buyer's own negligence, but only if such negligence is a concurring cause of the injuries, damages or losses covered by this Agreement. This provision shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Seller under any worker compensation acts, disability benefit acts or other employee benefit acts. Seller hereby waives any liens (in worker's compensation or otherwise) or other rights, liability caps or limits with respect to any contribution claims against it which it may have, including those arising as a result of being subrogated to any rights of its employees, and waives and agrees to defend, indemnify and hold harmless Buyer, for itself and its insurers, from any subrogation claims brought against Buyer in connection with this Agreement or otherwise.

21. **Insurance**
Notwithstanding the indemnification provisions set forth in the preceding paragraph, Seller agrees to maintain in full force and effect workers' compensation, comprehensive general liability, broad form extended casualty, employer's liability, automobile liability, product liability, completed operations coverage and insurance against any and all losses, damages, liabilities, claims, lawsuits, demands, costs and expenses (including attorneys' fees and expert expenses) that arise out of or are alleged to have arisen, directly or indirectly, in whole or part, from Seller's design, manufacture, sale, transportation, or distribution of any goods or services provided by or under this Agreement. The insurance provided hereunder shall include contractual liability coverage to cover Seller's obligations under this Agreement. Seller shall provide coverage for any acts of omission or commission, negligence, willful or wanton conduct or otherwise of Seller, its subcontractors, employees, workmen, servants, or agents, with limits of not less than $2,000,000 for each person and $4,000,000 for each occurrence, and property damage limits of not less than $5,000,000. Seller shall maintain Buyer as an additional insured on all such policies required under this Agreement. The coverage afforded to Buyer as additional insured under such policies shall be primary insurance. If Seller has other insurances, including self-insurance which is also applicable to the coverage, such other insurance shall be considered only as excess coverage over and above any and all of Seller's insurance. Seller shall obtain an endorsement to its policy to effect this priority of coverage. Buyer may, at its sole discretion, request that Seller provide certificates of insurance evidencing coverage as set forth herein. Seller retains the right to be represented, at its sole option and expense, by attorneys of its own selection in connection with any demands, claims, lawsuits, or other legal proceedings covered hereunder. The exercise of this right to select its own attorneys will in no way detract from or release Seller from its obligations to procure insurance as set forth herein. If any insurance is canceled or changed so as to limit the coverage as required hereunder, Seller shall provide at least ten days prior notice of such cancellation or change in coverage to Buyer. The failure to provide the insurance coverage hereunder shall constitute a material breach of this Agreement.

22. **Patent and Trademark Indemnification**
Seller agrees to defend, indemnify and hold Buyer harmless from any and all claims, causes of action, demands, or disputes which allege, in whole or in part, any United States or foreign patent or trademark infringement with respect to the sale, use, distribution or application of the goods or services provided by Seller. Said protection and indemnification shall include indemnification for expenses of litigation, court costs and attorney's fees.

23. **Forum Selection**
The parties consent to the exclusive and sole jurisdiction of the federal court located in Chicago, Illinois or the state court located in Albion, Illinois with respect to all litigation, claims, causes of action, demands, controversies or disputes among the parties.


EXHIBIT A

## Purchase Order Terms and Conditions

1. **DEFINITIONS.** "Buyer" means the company denoted as the buyer on the face of this purchase order. "Seller" means the company denoted as the seller on the face of this purchase order. "Order" means this purchase order and all referenced documents, exhibits, and attachments. "Product(s)" means the goods covered by this Order. "Specifications" means all instructions, specifications, drawings, data or other information identified in this Order and to which the Products must conform.

2. **TERMS AND ACCEPTANCE OF ORDER.** This Order is Buyer's offer to Seller. Acceptance of this Order is strictly limited to its terms. Buyer shall not be bound by and specifically objects to and rejects any term or condition whatsoever that is different from or in addition to the provisions of this Order, whether or not such term or condition will materially alter this Order. This Order will remain open for thirty (30) days. Buyer may withdraw this Order at any time before it becomes a contract pursuant to this Section or the expiration of the 30-day period, whichever comes first. This Order will become a contract: (i) when Seller's signed acknowledgment is received by Buyer; or (ii) when shipment of any Product according to the schedule in this Order is made; or (iii) when Buyer gives Seller written approval if Seller's acknowledgment of this Order contains any different term or condition from this Order.

3. **PRICE.** Prices stated in this Order are not subject to increase. By accepting this Order, Seller agrees that the prices, terms and conditions of this Order are at least as favorable to Buyer as are those prices, terms and conditions given by Seller to other purchasers of the same quality and quantity of Seller's Product. [If Buyer is able to purchase Products of comparable quality from another seller at a lower delivered cost that as specified in this Order, Buyer may give to Seller written notice of the same unless within five (5) days from the date of said notice, Seller does not reduce its prices to an amount equal to the price offered by the other seller, Buyer may purchase said Products from such other seller.] All Products so purchased shall be deducted from the remaining balance of Products to be purchased by Buyer from Seller. If Seller's quoted price(s) for the Products are reduced (whether in the form of a price reduction, close-out, rebate, allowances, or additional discounts) at the time of any shipment, the price(s) to Buyer for such Product(s) will be reduced accordingly, and Seller will invoice Buyer at such reduced prices. Unless stated otherwise in this Order, the prices in this Order do not include transportation charges, customs duties, or taxes, which charges will be separately stated on Seller's invoice.

4. **INVOICE AND PAYMENT.** Seller will date and send to Buyer a separate invoice for each shipment within two (2) business days following shipment. The invoice will include the original bill of lading or carrier's receipt, the Order number, and the name of the shipper. Payment due dates, including discount periods, will be calculated from the date of invoice. Unless freight and other charges are itemized, any discount will be taken on the full amount of invoice. Unless stated otherwise in this Order, payment is due within thirty (30) days following the date of the invoice. Payment does not constitute acceptance of the Products.

5. **PACKING AND SHIPMENT.** Unless otherwise specified, all Products to be delivered hereunder shall be boxed, crated, and stored without charge and shall be packed and packaged: (a) to insure safe arrival at their ultimate destination; (b) to secure the lowest transportation costs; and (c) to comply with requirements of common carriers. Seller is responsible for all damage resulting from improper packing, boxing, storage, or cartage. Seller will ship Products F.O.B. destination.

6. **DELIVERY.** Time is of the essence. If Seller fails to make shipment or delivery when due, Seller will immediately notify Buyer of the reason and length of the delay. Seller will use best efforts to avoid or minimize the delay, including but not limited to expending premium time and using the most expeditious transportation, at Seller's expense. Buyer may cancel this Order within two (2) business days following receipt of Seller's notice of delay. Buyer shall have the right to refuse or return at Seller's risk and expense shipments made in excess of the quantities contained herein or in advance of the delivery schedule.

7. **TITLE; RISK OF LOSS.** Seller assumes all risk of loss to the Products until they are delivered to the destination specified in this Order. **[Transfer of title: Title to the Products will pass to Buyer upon receipt at the designated destination, provided, however, that the risk of loss shall remain with Seller as to Products which are not accepted by Buyer or which are rejected by Buyer.] [Buy/Hold: Title to the Products shall pass to Buyer upon receipt of payment by Seller, provided, however, that the risk of loss shall remain with Seller until the Products are delivered to Buyer.] [Consignment: Title to the Products shall remain with Seller until the Products are sold, and all proceeds from the sale of the Products shall be held in trust for the benefit and for the account of Seller until fully accounted for provided, however, that the risk of loss shall remain with Seller until the Products are sold.]** If any of the Products are lost or destroyed prior to title passing to Buyer, Buyer may either cancel the entire Order or the affected part of the Order (at Buyer's option), or require Seller to deliver, at Seller's expense, substitute Products of equal quantity and quality as soon as commercially practicable. If loss of the Products is partial and Buyer does not cancel the entire Order, Buyer may require Seller to deliver the Products not lost or destroyed in accordance with the terms of this Order.

8. **INSPECTION; ACCEPTANCE.** All Products are subject to inspection at Buyer's destination. Prior payments or acceptance of shipments shall not be considered as waiving such right of inspection. Buyer may reject and refuse acceptance of any Products that do not conform to their Specifications or Seller's warranties. Buyer may return any rejected Products to Seller for full credit or replacement, at Buyer's option and at Seller's expense, including transportation charges both ways. Unless stated otherwise in this Order, Buyer will accept or reject the Products within ten (10) business days following delivery. If Seller fails to deliver any Products ordered or delivers any defective or nonconforming Products, Buyer may: (a) rescind this Order; (b) accept such Products at an equitable price reduction agreed by the parties; (c) reject such Products; or (d) demand specific performance.

9. **CANCELLATION.** Buyer may suspend or cancel this Order or any part of this Order at anytime up to three (3) days before Seller's scheduled shipment of the Products as indicated in this Order. If Buyer wishes to suspend or cancel any of this Order after such date, the parties will negotiate in good faith an equitable settlement for actual costs incurred by Seller for the Products and work in process as of the date Seller receives notice of such cancellation or suspension, such settlement not to exceed the price specified in this Order. Upon the happening of any one or more of the following events, and to the extent permitted by law, Buyer may cancel or terminate this Order without cost or liability to Buyer upon: (1) Seller's insolvency or inability to meet its obligations as they become due; (2) filing of voluntary or involuntary petition of bankruptcy by or against Seller; (3) appointment of a receiver for Seller by any court of competent jurisdiction; or (4) any assignment for the benefit of creditors by Seller. If Buyer has made any progress or other payment(s) to Seller on account of any Products prior to the time of any suspension or cancellation permitted under this Order, Buyer may enter the premises where the Products are being kept and take possession and ownership of and remove the Products so paid for, without liability.

10. **CHANGES.** Buyer may at any time issue a written change order to suspend performance of this Order (in whole or in part) or to make changes to the Specifications, quantities, schedule, or shipping, packing, or delivery instructions in this Order. If the change order causes an increase or decrease in Seller's cost or time required to fulfill this Order, Seller will notify Buyer of any such change. Seller will not perform or deliver, and Buyer will not be obligated to pay for, any services or Products related to the change order until the parties agree in writing to any equitable adjustment in the purchase price and/or delivery schedule.

11. **WARRANTIES; LIMITATION OF DAMAGES.** Seller expressly warrants to Buyer and Buyer's customers, that: (a) the Products will conform to the applicable Specifications in all material respects and will be suitable for the particular purpose or use for which they are purchased by Buyer; (b) the Products will be of good quality, material, and workmanship, and will be free from defects under normal use and regular service and maintenance for one (1) year from the date of sale (evidenced by Seller's invoice date); (c) the Products will be free and clear of all liens or encumbrances, and that Seller will have good, valid, clear, and absolute title to all Products and will transfer the same to Buyer; (d) the sale or use of the Products will not infringe or contribute to the infringement of any third party's patent, trademark, or copyright or any other proprietary right, and will not violate any third party's trade secret; (e) any services performed pursuant to this Order will be performed in a competent, workmanlike manner, in conformance with the Specifications in all material respects; and (f) the Products or services supplied pursuant to this Order are in compliance with all laws, rules, and regulations of local, state, and federal, or other governments and their subdivisions that govern the manufacture, sale, or delivery of the Products or services in this Order.

12. **INDEMNIFICATION.** Seller agrees, upon receipt of notification, to promptly assume full responsibility for the defense of any third-party claim against Buyer or any of its directors, officers, employees or customers: (i) that any of the Products infringes such party's patents, trademarks, or copyrights, or violates its trade secrets; or (ii) arising out of the design or manufacture or any of the Products. Seller agrees to indemnify Buyer against all damages and expenses (including but not limited to court costs and reasonable attorneys' fees) resulting from any such claim. Buyer may be represented by, and may actively participate through, its own counsel with respect to any such claim, at Buyer's own expense.

13. **SPECIAL TOOLING.** The term "special tooling" as used in this Order means all jigs, dies, fixtures, molds, patterns, special cutting tools, special gauges, special test equipment, other special equipment and manufacturing aids, and drawings, and any replacements of the foregoing, acquired or manufactured or used in the performance of this Order, that are of such a

**EXHIBIT B**

specialized nature that, without substantial modification or alteration, their use is limited to the production of the Products or parts for the Products or to the performance of the services of the type required by this Order. The term does not include: (i) items of tooling or equipment previously acquired by Seller (except if acquired for Seller to perform its obligations under a prior contract with Buyer), or replacement of any such tooling or equipment, whether or not altered or adopted for use in the performance of this Order; (ii) consumable small tools; (iii) general or special machine tools or similar capital items; or (iv) tooling, title to which is in Buyer. Seller agrees that it will retain, and not use or rework, the special tooling except for performance of work under this Order or as authorized in writing by Buyer. While in Seller's possession or control, Seller warrants that it will keep the special tooling in good condition fully covered by insurance, and will replace it when lost, destroyed, or necessary for performance of work under this Order. Upon cessation or termination of the work under this Order for which the special tooling is required, Seller will furnish Buyer a list of the products, parts, or services for the manufacture or performance of which such special tooling was used or designed and a list indicating where each item of the special tooling is located, and will: (i) transfer title to and possession of the special tooling to Buyer upon Buyer's payment of an amount equal to unamortized cost of the specialized tooling; or (ii) dispose of such special tooling as Buyer may authorize in writing. In addition, Buyer may take possession of any special tooling that Buyer purchased pursuant to this Section, and may enter Seller's premises for such purpose, without incurring any additional liability to Seller.

14. **PROPRIETARY RIGHTS.** Buyer reserves the right to review and approve any and all designs, blueprints, specifications, and engineering data used by Seller in manufacturing the Products. Seller will provide Buyer, at Buyer's request, with copies of any such designs, blueprints, specifications, and engineering data. All technical information in the nature of designs, blueprints, specifications, engineering data for production, or product know-how ("Technical Information") that Buyer supplies to Seller to facilitate or assign in the performance of this Order will, unless otherwise agreed, be kept confidential by Seller, and Seller will not disclose any such information in any way or use it in manufacturing products for others. All Technical Information Seller uses in the performance of this Order that is not supplied by Buyer will, unless otherwise agreed, be deemed Seller's confidential information, and if Buyer has access to any of such Technical Information, Buyer will keep it confidential and not use it or disclose it to any other party. For any Products produced to Buyer's particular Specifications, Seller agrees to assign to Buyer and not otherwise to make use of any invention, improvement, or discovery (whether or not patentable), conceived or reduced to practice in the performance of this Order by any employee of Seller or other person working under Seller's direction. Upon completion of Seller's performance of this Order and Buyer's payment in full, Seller will deliver to Buyer any and all information relating to any such invention, improvement, or discovery, and will cause its employees or others subject to its direction to execute as appropriate all documents reasonably necessary to enable Buyer to file applications for patents, copyright registrations, or other proprietary rights protection and to obtain title to such invention, improvement, or discovery. Seller will not, without Buyer's prior written consent: (i) publish the fact that Seller has furnished or contracted to furnish Buyer any products or services, or (ii) use any of Buyer's names or trademarks in Seller's advertising. If Seller places on any Products any of Buyer's trademarks or trade names (the Marks") at Buyer's direction, Seller acknowledges that all such Marks are the exclusive property of Buyer and that Seller will not acquire any rights in any of the Marks.

15. **INSURANCE.** Seller represents and warrants that Seller, and any subcontractor used by Seller in connection with the Order, shall carry Comprehensive General Liability and Comprehensive Automobile Liability Insurance with at least industry-standard policy coverages and limits. At Buyer's request, Seller shall provide to Buyer certificates from Seller's insurers showing that such coverages are in effect and require Buyer to be given thirty (30) days' prior notice of cancellation or alteration of coverage. Seller acknowledges that Buyer may require additional minimum liability coverage depending on the circumstances.

16. **COMPLIANCE WITH LAWS.** By acceptance of this Order, Seller agrees to comply with the provisions of the President's Executive Order 11246, as amended by Executive Orders 11375, 11625, 11701, and 11758, the regulations at 41 C.F.R. Parts 60-250.4 and 60-741.4 pertaining to Equal Employment Opportunity (38 U.S.C. 4301 *et seq.,* as amended), and Section 503 of the Rehabilitation Act of 1973, as any such Executive Orders, regulations, or laws may be amended during the term of this Order. Seller also agrees to comply with the Fair Labor and Standards Act and the Occupational Safety and Health Act, and all other applicable federal, state, county, and local laws, ordinances, regulations and codes in Seller's performance hereunder. Whether or not Buyer provides a Specification, if materials, services or containers furnished by Seller are required to be constructed, packaged, labeled or registered in a prescribed manner, Seller shall comply with the applicable federal, state, county and local laws, ordinances, regulations and codes. Seller further agrees to defend, indemnify and hold harmless Buyer and its customers from any loss or damage that may be sustained by Buyer, by reason of Seller's failure to comply with any such federal, state, county or local laws, ordinances, regulations or codes. In accordance with the Federal Hazard Communication Standard 29 CFR 1910, 1200, an OSHA 20 form or material safety data sheet (MSDS) must be provided for all regulated products that are supplied to Buyer. Seller represents and warrants that: (i) Seller and any and all of its parents, subsidiaries, affiliates, officers, directors, shareholders, employees, agents, and business partners, including all Seller's personnel (collectively, "Seller Parties") are in compliance with, in good standing under, and have not violated, any United States laws or the laws of any other country or countries relating to the transfer of technology, including, without limitation, the Export Administration Regulations, the International Traffic in Arms Regulations and the regulations administered by the Office of Foreign Assets Control of the Department of the Treasury, the PITEX/Maquiladora transfer protocols of Mexico or other similar laws or any foreign country listed on this Order (collectively, the "Transfer Control Laws"); (ii) Seller Parties are not, and never have been, named as a "debarred" party, "denied person or entity," "embargoed entity," or otherwise sanctioned under, or prohibited from engaging in activities subject to, the Transfer Control Laws; (iii) Seller will immediately notify Buyer in the event that any of Seller Parties are named as a "debarred" party, "denied person or entity," or "embargoed entity," or otherwise sanctioned under, or prohibited from engaging in activities subject to, the Transfer Control Laws; and (iv) Seller Parties will comply with all applicable Transfer Control Laws. Seller agrees to defend, indemnify and hold harmless Buyer and its customers from any loss or damage that may be sustained by Buyer, by reason of Seller's failure to comply with any of the Transfer Control Laws. Seller will cause this Section to be included in all subcontracts it enters into relating to this Order, unless exempted by applicable law.

17. **PRODUCT SAFETY.** Seller agrees to give immediate notice if any Product furnished hereunder fails to comply with applicable consumer product safety rules, which creates a substantial risk or injury to the public, or contains a defect which could create a substantial risk or injury to the public.

18. **GENERAL.** Neither party will be liable for any delay or failure of performance due to strikes, fires, acts of God, war, terrorism, or other causes beyond its reasonable control and without its fault or negligence, provided that the party subject to such cause gives written notice to the other as soon as the same could be anticipated, or if it could not be anticipated, as soon as possible following the commencement of such cause. If either party breaches any term or condition of this Order, the other party will have all remedies provided at law or in equity. IN NO EVENT WILL BUYER BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR OTHER DAMAGES EXCEPT FOR DIRECT DAMAGES, REGARDLESS OF WHETHER A CLAIM FOR SUCH DAMAGES IS BASED ON CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER LEGAL THEORY. The Order and any payments to be made hereunder shall not be assigned or transferred by Seller either by assignment or operation of law, without prior written approval of Buyer. Seller shall not subcontract any portion of the work to be performed hereunder without the prior written consent of Buyer. Buyer may assign this Order and its interest therein to any affiliated corporation, or to any corporation succeeding to Buyer's business, without the consent of Seller. This Order, including any attached exhibits or schedules and documents expressly incorporated by reference, constitutes the complete and final agreement between Buyer and Seller and supercedes all other agreements and understandings between the parties with respect to the subject matter of this Order. No additions to or modifications of this Order will be binding upon the parties unless in a writing executed by both parties. The failure of either party to enforce any term or condition of this Order will not be construed as a waiver or relinquishment of such right in the future. If any provision of this Order is or becomes illegal, void, or unenforceable, it will be deemed severed from the Order. All other provisions will remain valid and enforceable so long as the basic purpose of this Order can still be achieved. The terms and conditions of this Order will be construed in accordance with, and disputes will be governed by the laws of the State in which this Order is issued, as shown by Buyer's address on the face of this Order, without regard to its conflicts of laws principles. The United Nations Convention on Contracts for the International Sale of Goods and the United Nations Convention on the Limitation Period in the International Sale of Goods are not applicable to this Order.



Tefua Manufacturing Company, LTD
2F-1, No. 45, Minquan East Rd, Sec.1
Taipei, Taiwan R.O.C. Postal Code: 104
886-2-2586-5618 fax: 886-2-2586-3058

Mr. Bruce Zorich
CEO, United Components, Inc.

January 9, 2007

By fax : 1-812-867-4157

Dear Bruce:

I am happy to hear that the new water pump arrangement is working out and UCI has been able to enjoy increased profits from the Airtex/ASC combination. I did my best over the years to support the water pump programs. For the last six years I have done much to reduce the Airtex costs and give them the opportunity to compete. My two companies shipped approximately $31 million of parts to Airtex since 2000, which saved Airtex millions of dollars each year.

For the last few years raw material prices have risen very much. I know Airtex has absorbed some of these rising costs. I also absorbed much of the rising costs so I could help Airtex. My companies are much smaller than Airtex so the impact for me was very big but, I did it as a good partner to help build a better future for both Airtex and ACI/Tefua.

Shortly after UCI bought Airtex, Mr. Dee Monge and I visited with you in Atlanta to discuss China opportunities and how to support UCI. I learned and believed so strongly in your idea to use China to make UCI more competitive that I returned to China and built a large facility that could be used by all the UCI companies to have a manufacturing base in China. I even bought more land to put up another factory. Now, I need to return back the land to the government.

My companies have made a big contribution to water pumps including absorbing many tooling costs especially for many low volume items. Much of the tooling funds sent by Airtex really only touched the surface of my tooling costs.

I invested much in my factories and equipment over these years to make water pump and fuel pump parts. I made alliances with many top bearing and seal manufacturers and fuel pump companies for Airtex. I really hate to see this effort just sit idly by and not be used.

I tried my best to give Airtex and UCI reduced costs to be able to compete and add additional profits. ASC has requested that I return all the Airtex tooling, which means I have no way to recover the large investment I made.

Don't you agree a fair compensation needs to be made for my six years time and large contribution to Airtex?

I look forward to hear from you.

Best regards,

Tony L. Kuo

**EXHIBIT C**



Tefua Manufacturing Company, LTD
2F-1, No. 45, Minquan East Rd, Sec.1
Taipei, Taiwan R.O.C. Postal Code: 104
886-2-2586-5618 fax: 886-2-2586-3058

Mr. Bruce Zorich
CEO, United Components, Inc.

April 30, 2007

By fax : 1-812-867-4157

Dear Bruce:

I am writing as a follow up to my January letter asking about fair compensation for the six years that ACI contributed to Airtex. That question was never answered.

To help you understand the background. In 1999, I met with Dee Monge and Roy Xanders to discuss joining together to fight the competition by developing the water pump business in China for Airtex. Airtex needed a commitment and a partner. We discussed forming a joint venture. At that time, Airtex was not financially in a position to make a joint venture. I told Airtex that I would go to China first to build a company for the JV. Airtex had no issue with this arrangement although; we never formally wrote a contract to cover the intended relationship. We have been partners since.

Time flies. Since 1999 I have contributed very much to build the Airtex China presence through investment, development, and absorbing many costs, such as raw material increases. Airtex has enjoyed the big benefit we envisioned.

Mr. Dee Monge and I visited with you several times to discuss the China opportunities. We visited in Atlanta where I learned and believed so strongly in your idea to continue using China to make UCI more competitive. We visited with you to make proposals for an ACI-Airtex manufacturing facility in Tianjin for die casting, part manufacture, water pump and fuel pump assemblies

I understand that UCI has changed its policy regarding China investment and water pump operations with the purchase of the competitor. During the winding up of our business with Airtex I still helped by keeping a smooth flow of components as requested by UCI even though production was not economic or profitable. In good faith I cooperated as promised to keep a smooth flow of parts for my partner.

The relationship as perceived has ended. This leaves me no way to recover my large investment. I must recover financially for my sacrifices otherwise Airtex would have benefited much at my expense, which is unjust.

This is a very important. I am coming to UCI next week to close up the relationship and settle on equitable compensation.

Best regards,

Tony L. Kuo

Tony L. Kuo

**EXHIBIT D**



Tefua Manufacturing Company, LTD
2F-1, No. 45, Minquan East Rd, Sec.1
Taipei, Taiwan R.O.C. Postal Code: 104
886-2-2586-5618 fax: 886-2-2586-3058

Mr. Bruce Zorich
CEO, United Components, Inc.

October 18, 2007

Dear Bruce:

I am writing one last time to ask for fair compensation for the services that I provided to Airtex over the last six years. I have sent letters in January 2007 and April 2007 asking that UCI fairly compensate me for the large efforts I made on behalf of Airtex.

Maybe I did not provide enough details for you to show my efforts and the nature of the relationship between ACI and Airtex. I have attached information regarding my last six years of personal efforts and investment to build a China manufacturing base and presence for Airtex in China.

Since the announcement that UCI purchased ASC Industries, I honored the UCI and Airtex requests that ACI continue to supply and support Airtex needs. I also have been very honorable and did not seek out water pump business from any of the ASC-Airtex competitors. Six years ago I committed to joining with Airtex to help reduce costs and support Airtex and I kept that promise.

For six years my investment of time and money to build the business for Airtex exceeds $6 million. I must be fairly compensated for the value of the services I provided to the sole benefit of Airtex. I believe fair compensation for these six years is $2 million.

I provided invaluable services to Airtex with a reasonable expectation of being compensated through the business started for Airtex. Airtex certainly accepted all the benefits from my actions, and Airtex would be unfairly benefited if no compensation was paid to me. The fair value for my services is $2 million. I never had any reason to doubt the intentions of Airtex. Airtex had knowledge that I was investing to the Airtex benefit.

Please call me to discuss this urgent matter. China (m) 86-13901317415 or Taiwan (m) 886-932312171. I will visit with you at any time to resolve this matter equitably.

Best regards,

Tony L. Kuo

**EXHIBIT E**

**Wildman, Harrold, Allen & Dixon LLP**
225 West Wacker Drive
Chicago, Illinois 60606-1229
312-201-2000
312-201-2555 fax
www.wildmanharrold.com



Brian W. Lewis
312-201-2626
lewis@wildman.com

Wildman Harrold
*Attorneys and Counselors*

December 3, 2007

***By Courier***

Tony L. Kuo
Tefua Manufacturing Company, LTD
2F-1, No. 45, Minquan East Rd., Sec. 1
Taipei, Taiwan R.O.C.
Postal Code: 104

Dear Mr. Kuo:

I write in response to your letter of October 18, 2007 to Bruce Zorich. United Components, Inc. and Airtex Products, LP (Airtex) have retained us to serve as litigation counsel and respond to your recent claim for "fair compensation" for services you alleged to have provided Airtex beginning in 1999.

Airtex has investigated the facts surrounding its relationship with you and your companies and we have fully-evaluated your alleged claim. It is abundantly clear that your companies and Airtex never were partners, never formed a JV, and that Airtex and your companies dealt only at arm's length in a contractual, supply relationship. It is also clear that Airtex paid handsomely for its purchases from your companies, and that you are in no way entitled to any more money from Airtex in connection with your activities in China or anywhere else.

Contrary to your claims to Mr. Zorich, no partnership or JV between Airtex and either Tefua Manufacturing Company, LTD or Asian Century LTD ever was formed. The undeniable facts are that Tefua Manufacturing and Asian Century had only seller-customer relationships with Airtex – nothing more. Airtex bought in excess of $35 million worth of products from your companies on a purchase order basis, and the terms of those orders are wholly controlling. (A copy of the contract terms is enclosed for your reference.) You have never objected to any terms of those purchase orders. Indeed, these contract terms only further establish that you have no right to any compensation beyond that you already earned from your $35 million in sales to Airtex.

In your October 18, 2007 letter, you also threaten to file a lawsuit against Airtex. Setting aside the fact that any such action would be frivolous and meritless, you should be aware of the other factors that would make any litigation particularly burdensome and financially detrimental for you and your companies.

**EXHIBIT F**



First, you cannot in good faith allege that "all the facts and circumstances and actions by both sides" somehow support your claim that a partnership or joint venture was formed. In 1999, the parties expressly refuted any proposal to form a partnership or JV. Instead, you and Airtex decided to remain at arm's length and that Airtex would purchase products from your companies. The purchase orders, in Section 2, expressly state that they are the "complete, entire and exclusive statement of the terms of the understanding between the parties, merging and superseding all prior negotiations or agreements of the parties, either written or oral."

Second, you are advised that if you choose to proceed with litigation, although any court would promptly dismiss your baseless claims, you still must file your case in Illinois. Section 23 of the purchase order requires that any litigation be filed either in federal court in Chicago, Illinois, or in state court in Albion, Illinois.

Third, if you choose to proceed with litigation, you will be responsible for your own attorneys' fees. You will also have to reimburse UCI and Airtex the attorneys' fees and other costs they will incur to have your claim dismissed. (*See* Section 18)

Finally, Airtex has a substantial claim for conversion and breach of contract against your companies which, until this time, it has held in abeyance. Under Section 6, Airtex owns and has the right to seek the return of all the tooling it has provided your companies, the value of which is over $500,000. To date, you have wholly ignored Airtex's demands to return this tooling. Further delays are unacceptable. The tooling must be returned immediately or Airtex will seek relief in court.

I trust that this letter should completely answer your inquiry to Mr. Zorich and end any further requests by you for compensation from UCI or Airtex. However, if you have any reason to discuss that matter, you should contact me directly. On the issue of the tooling, please advise me of the arrangements for its immediate return to Airtex.

Very truly yours,

Brian W. Lewis

Enclosure




上 丰 机 械(天津)有 限 公 司

**Asian Century Industries (Tianjin) Ltd.**

中国天津市汉沽区大丰路 89 号 邮编：300480

**89th Dafeng Road, Hangu District, Tianjin China**

**Tel: 86 22 6711 5861** **Fax: 86 22 6711 5907**

**Email: acitj@vip.sina.com** **Zip Code: 300480**

Mr. Brian W. Lewis
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229, USA

Date: Jan. 07,2008

Dear Mr. Lewis:

Thank you for your recent letter regarding ACI and Airtex. I am sorry if my letter gave Bruce the idea I was ready to sue UCI. My relationship with Airtex has been built upon respect and hard work. Our relationship has been a partnership so I never will treat Airtex as an enemy. I am sorry if I gave the wrong impression.

I do not know anything about a breach of contract. I guess I do not understand all the legal things about contracts in America. Maybe you can explain how all my activities for Airtex are not like a contract. My view from the beginning in 1999 is we developed the business exclusively for Airtex. Re purchase orders, you know, you still must send purchase orders to JV companies or to direct subsidiaries, so sending orders does not mean no contract relationship was developed.

If you can satisfy me with a detailed explanation of why all the activities I did for Airtex benefit are not contract types, I will reconsider my position. If I can't accept your explanation I will need to visit with UCI or Carlyle to get someone to understand my position.

I have protected any tooling developed for Airtex, and have not used any of the tooling for any reason. I value the partnership so much that I would not try to go to the competitors. Please understand to fulfill the Airtex requirement of many modle of parts, I have to develop different sources and casting tooling is at many locations. I need to spend much money and time to get the tooling returned to the ACI factory, especially production stopped over a year now.

**EXHIBIT G**

ACI has many costs now, because we stopped manufacturing for our partner. The business was set-up specifically for Airtex benefit to reduce their costs especially after they lost the Federal-Mogul business. Since then I went to China set up ACI about 6 years ago. Airtex did save much money but because UCI bought out ASC, they don't need ACI any more and now ACI needs to close the door. I need to pay workers costs, I need to get all the tooling arranged, I have dedicated manufacturing lines, I have extra inventory made to support Airtex, over one million dollars loss from Airtex UK bankruptcy not settled yet, and many other costs to shut down. For all my efforts to build Airtex a low cost manufacture I only asked for very reasonable compensation compared to what UCI paid to buy ASC.

You know that Roy Xanders came to ACI many times and audited the books to be sure the costs were okay and Airtex sent Jerry Pollard who stayed about four years at ACI , ACI opened house for Jerry Pollard, only because we are partner, I don't see Airtex send his personal to any other supplier. The Airtex sales brochures and trade show booths showed ACI as part of Airtex family. These things would never happen in a normal business relationship.

I appreciate very much to Bruce, he was nice enough to offer introductions to other UCI business and told me that I can go to sell to other water pump competitors, but first I cannot take all the time to develop new product lines and my business has been water pumps and ACI had been focused on it for Airtex only, to go to compete, I had never even think about. The other UCI business is very different, yes, I am only 65, but it will take quite time, I am afraid I won't able to do a good job.

I hope everybody enjoyed their holiday break and a Happy New Year.

Very truly yours,

Tony I. Kuo

Tony I. Kuo

cc: Dee Monge
Bruce Zorich

**Wildman, Harrold, Allen & Dixon LLP**
225 West Wacker Drive
Chicago, Illinois 60606-1229
312-201-2000
312-201-2555 fax
www.wildmanharrold.com



Wildman Harrold
*Attorneys and Counselors*

Brian W. Lewis
312-201-2626
lewis@wildman.com

February 18, 2008

***By E-mail & First Class Mail***

Tony L. Kuo
Asian Century Industries (Tianjin) Ltd.
89th Dafeng Road, Hangu District
Tianjin, China
Zip Code: 300480

Dear Mr. Kuo:

I received your letter of January 7, 2008 and have reviewed it with my clients, Airtex Products, LP and United Components, Inc.

We are absolutely confident that no partnership or joint venture ever was formed between you or Asian Century Industries (ACI) and our clients. We also see no reason why you (or ACI) is in any way entitled to additional compensation beyond the substantial revenues that you already earned from sales to Airtex. Given the fact that no compensation is owed to you or ACI, we decline to respond to your request for a "detailed explanation" of the contractual nature of the relationship between ACI and Airtex. You should review the form purchase order we provided which establishes in plain language the nature of the relationship. In sum, we consider this issue to be closed.

Finally, with respect to ACI's obligation to return Airtex's tooling, we accept in good faith the representation that you "have not used any of the tooling for any reason." While Airtex reserves all of its rights to seek the relief to which it is contractually entitled, we accept that you will continue to honor your obligation not to use, sell, or otherwise make commercial advantage of Airtex's tooling.

Very truly yours,

Brian W. Lewis

**EXHIBIT H**

**GUICHARD, TENG & PORTELLO, A.P.C.**
Attorneys at Law
Sutter Square
1800 Sutter Street, Suite 730
Concord, CA 94520
Tel: (925) 459-8440
Fax: (925) 459-8445
http://www.gtlaw.net

Matthew P. Guichard
William L. Portello*
Christopher K. Teng
Theresa A. Baumgartner
Erika Portillo†
Stacey Stevens
David D. Little *(Of Counsel)*
Kang Lim *(Of Counsel)*

*Also admitted in Oregon
†Also admitted in Mexico

April 28, 2008

Matthew P. Guichard
Email: mattg@gtlaw.net

***Via Facsimile and U.S. Mail***
***(312) 201-2555***

Brian W. Lewis
Wildman, Harrold, Allen & Dixon, LLP
225 West Wacker Drive
Chicago, IL 60606-1229

Re: ***Tony Kuo, Asian Century Industries (Tianjin) Ltd., and Airtex Products, LP***

Dear Mr. Lewis:

We represent the interests of Tony Kuo and Asian Century Industries (Tianjin) Ltd. ("ASI") We write in response to your replies to Mr. Kuo's letters regarding his claims against Airtex Products, LP ("Airtex"). Since you are familiar with the underlying facts, we will not restate them here.

Although there was no written contract, we contend that there was an implied-in-fact contract. "An implied contract is one, the existence and terms of which are manifested by conduct." §4 Restatement of Contracts 2nd. Under the facts and circumstances, there was a mutual intention to contract. Meetings between the primary players discussed the formation of a joint venture (our respective firms were involved in the review of a joint venture contract); Mr. Kuo with the knowledge and assent of Airtex, built an exclusive factory in China for the sole production of Airtex products; Airtex received special pricing on the products that were akin to that of a joint venture partner, not raising prices when the cost of raw materials inevitably rose; throughout the six years, the key players from Airtex and ASI all believed that there was a special relationship above and beyond that of a simple supplier-buyer relationship between Airtex and Mr. Kuo or ASI. Emails sent to Mr. Kuo also reinforced that belief. We are again providing you with a complete file prepared by Mr. Kuo containing key documents that support our position. All we ask is for you and Airtex to seriously, and in good faith, reconsider Mr. Kuo's claims.

If you disagree that a joint venture contract was implied in fact, we contend that one should be implied in law. As you know, the law of quasi-contract was established by the Courts to compensate an injured party for the fair value of the work and services rendered and thus prevent an unjust enrichment to another. The facts of this case presents a classic example where the Courts would uphold such a claim. Airtex specifically and expressly requested the benefit to be conferred -

**EXHIBIT I**

by asking Mr. Kuo to build an exclusive facility in China to accommodate the business plans of UCI and Airtex's development in China.

In *Creative Demos, Inc., v. Wal-Mart Stores, Inc. 955 F.Supp. 1032, 1045 (S.D. Ind. 1997)*, a federal court, applying Indiana law, upheld a very similar claim. When Wal-Mart bought a chain of large grocery stores (and renamed them "Sam's Club"), the stores were using a company named Creative Demos to do food demonstrations in the stores. Wal-Mart and Creative Demos had some discussions, but Wal-Mart was not contractually bound to use Creative Demos and engaged another company to perform essentially the same services. However, some of the Creative Demos work product wound up assisting the new company in its preparations for the Sam's Club operations. The complaint contained counts sounding in tort (fraud) and contract based on detrimental reliance and promissory estoppel. After a jury trial, plaintiff obtained a verdict of $681,126 in compensatory damages on the promissory estoppel claim. Without motion or discussion by either party, the court, in ruling on Wal-Mart's motion for judgment as a matter of law or for a new trial, sustained the verdict but on the basis of unjust enrichment rather than promissory estoppel. The jury's verdict was based on the plaintiff's lost profits, which should have been paid to it by Wal-Mart because the plaintiff provided services and work product to Sam's Club at the request of the latter and to its benefit. In a suit by Creative Demos, the United States Court of Appeals for the Seventh Circuit concluded that Creative Demos could not base its claim on its own alleged loss of profits but only on what Wal-Mart gained by the retention of the Creative Demos work product and the sharing of it with the successor food demonstration company.

We disagree with your position that the terms contained in purchase orders were the definitive terms of the relationship between Airtex and ASI or Airtex and /Tony Kuo. Those purchase orders were sent by Airtex to ALL its suppliers. The purchase order is a contract that covers the scope of the sale of specific products. Mr. Kuo's claims do not fall within that limited scope. Your argument portents to narrow the scope of Mr. Kuo's claims to that of a mere supplier, when in fact, Mr. Kuo does not only claim to be a supplier of those parts, but also claim that under the totality of circumstances, the setting up of the exclusive factory for Airtex, the accommodation of Airtex personnel for six years, the exclusive nature of everything ASI provided to Airtex, and the personal time and effort asserted by Mr. Kuo for the exclusive benefit of Airtex, (without any form of monetary compensation from either Airtex or ASI) evidences a business relationship that is far more complex than a mere supplier-buyer relationship.

Finally, Mr. Kuo can prove benefit that Airtex derived from the joint venture relationship of more than $6 million. Mr. Kuo only requests just compensation of $2 million. That is certainly fair under the circumstances. We again ask that you and Airtex reconsider your position.

Please do not hesitate to contact me should you have any questions or comments about this matter.

Very truly yours,

GUICHARD, TENG & PORTELLO

Matthew P. Guichard

MPG/ckt

Enclosure (via mail only)

cc: Tony Kuo